1

2

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

3

DAVID A HANO,

Case No. 2:19-cv-02246-GMN-EJY

4

Plaintiff

SCREENING ORDER ON FIRST
AMENDED COMPLAINT

5

v.

6

STATE OF NEVADA, et al.,

7

Defendants

8

9     Plaintiff, who is in the custody of the Nevada Department of Corrections ("NDOC"),

10   has filed an application to proceed *in forma pauperis* and a second motion for appointment

11   of counsel.  (ECF No. 11, 16).  He also has filed a motion to submit an amended civil

12   rights complaint under 42 U.S.C. § 1983 along with an amended complaint.  (ECF No.

13   21, 21-1). Based on the financial information provided, the Court finds that Plaintiff is

14   unable to prepay the full filing fee in this matter and grants the application to proceed *in*

15   *forma pauperis*. The motion to file an amended complaint (ECF No. 21) also is granted.[1]

16   The Court now screens Plaintiff's first amended civil rights complaint under 28 U.S.C. §

17   1915A and addresses the second motion for appointment of counsel.

18   **I.     SCREENING STANDARD**

19         Federal courts must conduct a preliminary screening in any case in which a

20   prisoner seeks redress from a governmental entity or officer or employee of a

21   governmental entity.  *See* 28 U.S.C. § 1915A(a).  In its review, the court must identify any

22   cognizable claims and dismiss any claims that are frivolous, malicious, fail to state a claim

23   upon which relief may be granted, or seek monetary relief from a defendant who is

24   immune from such relief.  *See* 28 U.S.C. § 1915A(b)(1),(2).  *Pro se* pleadings, however,

25   must be liberally construed. *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir.

26   1990).  To state a claim under 42 U.S.C. § 1983, a plaintiff must allege two essential

27

28   [1] An amended complaint replaces an earlier complaint.  *See Hal Roach Studios, Inc. v. Richard Feiner & Co., Inc.*, 896 F.2d 1542, 1546 (9th Cir. 1989).  Therefore, the operative complaint here is the first amended complaint (ECF No. 21-1).

elements: (1) the violation of a right secured by the Constitution or laws of the United States, and (2) that the alleged violation was committed by a person acting under color of state law. *See West v. Atkins*, 487 U.S. 42, 48 (1988).

In addition to the screening requirements under § 1915A, pursuant to the Prison Litigation Reform Act (PLRA), a federal court must dismiss a prisoner's claim if "the allegation of poverty is untrue" or if the action "is frivolous or malicious, fails to state a claim on which relief may be granted, or seeks monetary relief against a defendant who is immune from such relief." 28 U.S.C. § 1915(e)(2). Dismissal of a complaint for failure to state a claim upon which relief can be granted is provided for in Federal Rule of Civil Procedure 12(b)(6), and the court applies the same standard under § 1915 when reviewing the adequacy of a complaint or an amended complaint. When a court dismisses a complaint under § 1915(e), the plaintiff should be given leave to amend the complaint with directions as to curing its deficiencies, unless it is clear from the face of the complaint that the deficiencies could not be cured by amendment. *See Cato v. United States*, 70 F.3d 1103, 1106 (9th Cir. 1995).

Review under Rule 12(b)(6) is essentially a ruling on a question of law. *See Chappel v. Lab. Corp. of America*, 232 F.3d 719, 723 (9th Cir. 2000). Dismissal for failure to state a claim is proper only if it is clear that the plaintiff cannot prove any set of facts in support of the claim that would entitle him or her to relief. *See Morley v. Walker*, 175 F.3d 756, 759 (9th Cir. 1999). In making this determination, the court takes as true all allegations of material fact stated in the complaint, and the court construes them in the light most favorable to the plaintiff. *See Warshaw v. Xoma Corp.*, 74 F.3d 955, 957 (9th Cir. 1996). Allegations of a *pro se* complainant are held to less stringent standards than formal pleadings drafted by lawyers. *See Hughes v. Rowe*, 449 U.S. 5, 9 (1980). While the standard under Rule 12(b)(6) does not require detailed factual allegations, a plaintiff must provide more than mere labels and conclusions. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). A formulaic recitation of the elements of a cause of action is insufficient. *Id.*

1    Additionally, a reviewing court should "begin by identifying pleadings [allegations]
2    that, because they are no more than mere conclusions, are not entitled to the assumption
3    of truth." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009).   "While legal conclusions can
4    provide the framework of a complaint, they must be supported with factual allegations."
5    *Id.*  "When there are well-pleaded factual allegations, a court should assume their veracity
6    and then determine whether they plausibly give rise to an entitlement to relief."  *Id.*
7    "Determining whether a complaint states a plausible claim for relief . . . [is] a context-
8    specific task that requires the reviewing court to draw on its judicial experience and
9    common sense."  *Id.*

10    Finally, all or part of a complaint filed by a prisoner may therefore be dismissed
11    *sua sponte* if the prisoner's claims lack an arguable basis either in law or in fact.  This
12    includes claims based on legal conclusions that are untenable (e.g., claims against
13    defendants who are immune from suit or claims of infringement of a legal interest which
14    clearly does not exist), as well as claims based on fanciful factual allegations (e.g.,
15    fantastic or delusional scenarios).  *See Neitzke v. Williams*, 490 U.S. 319, 327-28 (1989);
16    *see also McKeever v. Block*, 932 F.2d 795, 798 (9th Cir. 1991).

17    **II.    SCREENING OF FIRST AMENDED COMPLAINT**

18    In the First Amended Complaint ("FAC"), Plaintiff sues multiple defendants for
19    events that alleged took place while he was incarcerated at High Desert State Prison
20    ("HDSP").  (ECF No. 21-1 at 1).  He sues the Nevada Department of Corrections[2], James
21    Dzurenda, Brian Williams, Michael Miner, R.N. Mary, Weber, Findley, Nurse Jaymie,
22
23    _____

24    [2] The Court dismisses, with prejudice, all § 1983 claims against the NDOC.
25    Amendment would be futile because the NDOC is an arm of the state of Nevada and is
    not a "person" subject to suit for purposes of 42 U.S.C. § 1983.  *See Doe v. Lawrence
    Livermore Nat. Lab.*, 131 F.3d 836, 839 (9th Cir. 1997); *Black v. Nevada Dep't of Corr.*,
26    2:09-cv-2343-PMP-LRL, 2010 WL 2545760, *2 (D. Nev. June 21, 2010).  The Court also
27    dismisses without prejudice and without leave to amend all the state law claims against
    the NDOC based on Eleventh Amendment sovereign immunity.  *See Brooks v. Sulphur
28    Springs Valley Elec. Co-op.*, 951 F.2d 1050, 1053 (9th Cir. 1991) (holding that the
    Eleventh Amendment's jurisdictional bar covers suits naming state agencies and
    departments as defendants in federal court).

1  Faulkner, Matousik, Dr. Bryan, the HDSP Medical Department[3], Rhynard, Warden

2  Johnson, A.W. Bean, G. Piccinini, Hubbard-Pickett, and Mathison.  (*Id.* at 2-3).  Plaintiff

3  also sues John Does 1-10.[4]  (*Id.* at 3.)  Plaintiff brings two counts and seeks damages,

4  declaratory relief, and injunctive relief.  (*Id.* at 21, 25).

5          **A.  Count One**

6          Count One alleges the following.  On or about January 18, 2018, Plaintiff suffered

7  major heart failure.  (ECF No. 21-1 at 4).  After calling a man down, medical staff and Lt.

8  McKean responded and arrived at Plaintiff's cell.  (*Id.*)  A male nurse asked Plaintiff if he

9  could walk outside the unit because they did not have a gurney in the unit and the unit

10  was upstairs.  (*Id.*)  Plaintiff walked down the stairs before he collapsed due to heart

11  failure.  (*Id.*)  While Plaintiff lay on the floor, medical staff, including John Doe 3, simply

12  stood over Plaintiff.  (*Id.*)  Nobody took any action to provide CPR.  (*Id.*)  After repeated

13  yells from other inmates for some kind of action to save Plaintiff's life, correctional officer

14  Thompson arrived in the unit and, after observing Plaintiff's condition, started performing

15  CPR on Plaintiff and saved his life.  (*Id.*)  Medical staff John Doe 1 and John Doe 2 took

16  no actions to save Plaintiff's life.  (*Id.* at 5).  Plaintiff would have died if correctional officer

17  Thompson had not arrived.  (*Id.*)

18          Plaintiff was taken to the infirmary, where medical staff had to perform CPR again

19

20          [3] The Court dismisses with prejudice all § 1983 claims against the HDSP Medical
Department, as it is an arm of the state of Nevada and is not subject to suit for purposes
21  of 42 U.S.C. § 1983.  *See Maciel v. Rowland,* 5 F.3d 537 (9th Cir. 1993).  The Court also
dismisses without prejudice and without leave to amend all the state law claims against
22  the HDSP Medical Department based on Eleventh Amendment sovereign immunity. *See
Brooks,* 951 F.2d at 1053.
23

24          [4] As a general rule, the use of "Doe" pleading to identify a defendant is not favored.
*Gillespie v. Civiletti,* 629 F.2d 637, 642 (9th Cir. 1980).  However, the Court recognizes
25  that there are situations "where the identity of alleged defendants will not be known prior
to the filing of a complaint."  *Id.*  Therefore, if a plaintiff adequately describes a Doe
26  defendant so that the identity of that particular person can be identified through discovery
and if the plaintiff alleges specific acts by that particular Doe defendant that states a
27  colorable claim against that Doe defendant, then the Court later will permit the plaintiff to
engage in discovery to attempt to learn the name of that particular Doe defendant.  *Id.* at
28  642-43.  Plaintiff is cautioned that a complaint cannot be served on a Doe defendant.
Therefore, once a plaintiff learns the identity of the Doe defendant, the plaintiff would have
to move to substitute the person's real name in an amended complaint.

1  and use the defibrillator.  (*Id.*)  He was taken by ambulance to Centennial Hills Hospital
2  ("CHH").  (*Id.*)  When Plaintiff arrived at the hospital, he was rushed to surgery. (*Id.*)

3      At the hospital, Dr. Malhi determined that Plaintiff had suffered cardiac arrest.  (*Id.*)
4  On or about January 22, 2018, before Plaintiff was discharged from the hospital, Dr. Malhi
5  explained the seriousness of Plaintiff's conditions and the importance of following the
6  prescribed treatment.  (*Id.*)  The doctor prescribed cardiac therapy and prescribed eight
7  medications.  (*Id.*)  Dr. Malhi explained that it was important for Plaintiff to take the
8  medication and told Plaintiff that he was providing him with a 30-day supply of medicine
9  so that there would not be an interruption in Plaintiff's treatment.  (*Id.*)  Dr. Malhi also
10 instructed that Plaintiff should be seen for follow up two weeks later.  (*Id.* at 5-6).

11     When Plaintiff left CHH, he asked the transport officers if they had Plaintiff's
12 information and the 30-day supply of medications provided by Dr. Malhi.  (*Id.* at 6).  The
13 officers, John Doe 3 and John Doe 4, said that HDSP Medical would handle that.  (*Id.*)
14 Plaintiff arrived at HDSP without the 30-day supply of medication.  (*Id.*)  They "should
15 have known" that they were required to take Plaintiff's medication with them.  (*Id.*)

16     When Plaintiff arrived at HDSP, he was seen by prison physician Dr. Bryan. (*Id.*)
17 When Plaintiff asked about his medications, Dr. Bryan said that HDSP did not carry
18 Plaintiff's prescriptions and they would have to be ordered.  (*Id.*)  Plaintiff told Dr. Bryan
19 that, prior to being discharged from the hospital, Dr. Malhi had provided him with a 30-
20 day supply of medication so that his treatment would not be interrupted.  (*Id.*)  Dr. Bryan
21 ignored the fact that Dr. Malhi had provided him with a 30-day supply of medication and,
22 rather than having the medications retrieved from the hospital, defendant Bryan simply
23 stated that the medications would have to be ordered and said that it would take a few
24 days to get the medications.  (*Id.*)   Plaintiff told Dr. Bryan that a few days without his
25 medications could result in Plaintiff suffering another heart attack. (*Id.*)  Dr. Bryan stated
26 "Well let's hope that doesn't happen."  (*Id.*)

27     The next day, Plaintiff still had not received any medication.  (*Id.* at 7). Plaintiff
28 made repeated requests to be provided with his medications.  (*Id.*)  These requests were

given to John Does 4-10 and the HDSP Medical Department.  (*Id.*) Despite the fact that Plaintiff had just been discharged from the hospital after undergoing surgery for a heart attack, and knowing that Plaintiff required these medications in order for his blood platelets not to block the stent, these employees, staff, and nurses ignored his numerous requests for medication.  (*Id.*)

On the following day, Plaintiff repeatedly asked John Does 3-10 for his medications.  (*Id.*)  They denied those requests.  (*Id.*)  Nurse Jennifer told Plaintiff that they were on order and instructed him to stop asking.  (*Id.*)  These Defendants failed to provide Plaintiff with the medications out of floor stock or ensure that his medications were rushed from the pharmacy or from CHH.  (*Id.*)

On January 25, 2018, three days after being released from the hospital, Plaintiff had received only a couple of pills from the morning nurse at pill call.  (*Id.*)  The nurse informed Plaintiff that he should receive the rest of the medication that evening.  (*Id.*)  However, Plaintiff began to experience severe chest pain and was transferred by ambulance back to CHH for further cardiac treatment.  (*Id.*)

When Plaintiff arrived at CHH, the treating cardiologist and doctor were shocked that Plaintiff had not been receiving the medication ordered by Dr. Malhi.  (*Id.*)  Plaintiff suffered chest pain because Dr. Bryan and Does 4-10 denied him his medication for three days.  (*Id.*)

When Plaintiff was being discharged from the hospital, the cardiologist came to Plaintiff's hospital room and told Plaintiff that it was very important that he not miss any of the doses of any of the medications as they all worked together to prevent another heart attack.  (*Id.* at 7-8).  The cardiologist told Plaintiff that he was keeping him on the same medications and treatment plan as Dr. Malhi and was adding nitroglycerine as an emergency drug to stop an oncoming heart attack.  (*Id.* at 8).

On April 14, 2018, Plaintiff filed an informal grievance "over not being provided his life sustaining medications."  (*Id.*)  The informal grievance was denied at the informal level by Buen.  (*Id.*)  It was denied at the first level by Faulkner, and at the second level by

Miner.  (*Id.*)

On or about March 23, 2018, Plaintiff filed an emergency grievance requesting one of his prescription medications.  (*Id.*)  On or about March 26, 2018, Plaintiff filed another emergency grievance requesting the medication.  (*Id.*)  Plaintiff was taken to the Medical Department where he was seen by Nurse Jaymie, who advised Plaintiff that it would not hurt Plaintiff to miss a few doses.  (*Id.*)  She told him that she was aware of his medical history and that he would receive the medication by the end of the week.  (*Id.*)  On March 28, 2018, Plaintiff finally received his medications after going 16 days without medication. (*Id.*)  Plaintiff could have and should have been provided with the medication from floor stock.  (*Id.*)

On or about June 25, 2018, Plaintiff wrote a kite to the "advanced clinical provider," explaining that he was not receiving his medications in a timely manner.  (*Id.*)  The "medical department defendants" responded by telling Plaintiff to submit requests for refills when he had 5-7 pills remaining, which is what Plaintiff had been doing.  (*Id.* at 8-9).

On or about July 27, 2018, Plaintiff was without his medications for ten days, so he filed an emergency grievance.  (*Id.* at 9).  Defendant Matousik denied this grievance. (*Id.*)

On or about November 11, 2018, Plaintiff submitted a request to see Dr. Bryan. (*Id.*)  Plaintiff complained of chest pain, shortness of breath, and lack of energy.  (*Id.*) Despite the Plaintiff's medical history, including heart attacks, and despite the symptoms being precursors to a heart attack, "Defendants John Does 4-10 failed to see the Plaintiff." (*Id.*)  Five days later, on or about November 16, 2018, Plaintiff still had not seen by defendants and he started to experience severe chest pains, shortness of breath, vomiting, blurred vision, and weakness.  (*Id.*)  He called a man down and was transferred to Valley Hospital for cardiac arrest.  (*Id.*)  This was a direct result of defendants' continued failure to provide Plaintiff with his medications on time.  (*Id.*)

On or about November 27, 2018, after being discharged from the hospital, Plaintiff

submitted an emergency grievance to get all his medications. (*Id.*) Lieutenant Matousik denied the grievance on the basis that it was not considered an emergency under A.R. 740 but said that Medical was contacted and Plaintiff's pills would be given to Plaintiff that week. (*Id.*) Plaintiff concludes that Defendants Dr. Bryan and John Does 4-10 were ignoring the cardiologist's orders not to interrupt Plaintiff's treatment and did not provide Plaintiff with his medication for days even when his medication was in Medical. (*Id.*)

On or about May 6, 2019, having no pills left, Plaintiff filed an emergency grievance requesting his mediations. (*Id.*) Defendant Matousik denied Plaintiff's grievance without addressing the emergency and said that it was not an emergency. (*Id.*) Matousik was aware of Plaintiff's serious medical issues but chose to ignore the fact that he was not receiving his life-saving medications. (*Id.*)

On or about May 13, 2019, Plaintiff submitted a request for refills for all his medications. (*Id.* at 10). Twelve days later, Plaintiff's medication was delivered except for the nitroglycerine, which Plaintiff was told was on order. (*Id.*)

On or about June 6, 2018, Plaintiff submitted an emergency grievance for nitroglycerine for chest pain. (*Id.*) Matousik told Plaintiff that it was not an emergency according to A.R. 740. (*Id.*) On or about June 6, 2018, Plaintiff filed an informal grievance. (*Id.*) Mathison responded by claiming that the grievance was resolved because Plaintiff received the refill on June 8, 2020. (*Id.*) This ignored the fact that Plaintiff has been without the medication for 20 days. (*Id.*) Faulkner denied the first level grievance and Miner denied the second level grievance. (*Id.*) Plaintiff asserts that each of these Defendants was "on notice that Plaintiff was being denied his medication for long periods of time contrary to the cardiologists' recommendations" and that their failure to take action to ensure this delay in treatment did not continue constituted deliberate indifference. (*Id.*)

On June 13, 2019, Plaintiff submitted a request for seven medications. (*Id.*) On June 16, 2019, Plaintiff filed an informal grievance, which was denied by Matousik. (*Id.*) The first level grievance was denied by Williams and the second level grievance was denied by Miner. (*Id.* at 10-11). Plaintiff asserts that each of these Defendants was on

1 notice that Plaintiff was being denied his medications, that he needed the medications to

2 ensure that he did not suffer further heart complications, but nevertheless failed to take

3 any action to ensure that Plaintiff received his medications in a timely manner.  (*Id.*)

4 Defendants were "on notice that Plaintiff was being denied his medication for long periods

5 of time contrary to the cardiologists' recommendations" and that their failure to take action

6 to ensure this delay in treatment did not continue constituted deliberate indifference.  (*Id.*)

7        On June 22, 2019, when Plaintiff still had not received any of his requested

8 medications, he asked Nurse Greta to see about getting him medications. (*Id.*)   She told

9 him to keep kiting Medical because they are slow up there.  (*Id.*)

10       On June 24, 2019, Plaintiff sent a request to Nurse Mary, asking if she would see

11 about getting his medications, but she did not get him his pills.  (*Id.*)  The next day, he

12 explained to her the seriousness of skipping his medication and that he could end up in

13 the emergency room again.  (*Id.*)   When he still had not received his medication on June

14 26, 2019, Plaintiff spoke to Lieutenant Matousik and explained that he had been out of

15 his medication for days, which could result in cardiac arrest.  (*Id.*)  Lieutenant Matousik

16 called over defendant Findley and told Plaintiff to talk to Findley because she had to get

17 her paint crew straightened out.  (*Id.*)   Plaintiff appears to assert that Matousik was

18 required to take direct action herself rather than passing the issue on to a subordinate.[5]

19 (*Id.*)

20       Plaintiff explained to Findley that he had suffered a heart attack and requires

21 medication to stay alive but it had been days since he had his medications.  (*Id.*)  Findley

22 said that he would contact Medical and get back in touch with Plaintiff. (*Id.*)  Findley never

23 got back in touch with Plaintiff and there is no record that he ever contacted Medical.  (*Id.*)

24 Later that afternoon, Plaintiff spoke with defendant Weber and recounted the

25 conversation he had with Findley and asked Weber if he could contact Findley or the

26 _____

27       [5] Such an assertion is not sufficient to show deliberate indifference by Matousik, and Plaintiff does not allege facts that would show that Matousik was aware that Findley

28 and Weber had not contacted Medical to arrange for the delivery of Plaintiff's medication. Therefore, Plaintiff has not alleged facts sufficient to show deliberate indifference by Matousik based on this particular incident.

1   medical staff.  (*Id.*)   Weber said, "we're busy and we probably will not get back to you."

2   (*Id.*)  Plaintiff concludes Weber's and Findley's failure to contact Medical was deliberate

3   indifference.  (*Id.*)

4         On June 27, 2019, Plaintiff asked the morning pill call nurse if he had any

5   medication for Plaintiff.  (*Id.* at 12-13).  John Doe 5 said "no."  (*Id.* at 13).  Plaintiff explained

6   what his medications were for and that he had not received a refill in two weeks and was

7   not feeling well.  (*Id.*)  Defendant John Doe said that he would locate the medications, but

8   no pills were given to Plaintiff.   (*Id.*)   Later that day, Plaintiff started experiencing

9   symptoms of a heart attack and was transported to Medical.  (*Id.*)  Dr. Bryan determined

10  that Plaintiff needed to be transferred to a hospital by ambulance.  (*Id.*)   While Plaintiff

11  was waiting for the ambulance, Dr. Bryan asked Plaintiff what brought on the chest pains

12  and Plaintiff explained that he had been out of medication for almost two weeks.  (*Id.*)  Dr.

13  Bryan asked John Doe 6 to check and see if the medication was present.  (*Id.*)   John

14  Doe 6 returned within five minutes and informed Defendant Bryan that the prescriptions

15  had been there for a few days and were to be delivered that week.  (*Id.*)  If John Does 1-

16  10 had looked for and delivered the medication any of the times he requested them, he

17  would not have had the heart problems that day.  (*Id.*)  Had Matousik ensured that Plaintiff

18  received the medication when he spoke to her on June 26 and if Weber and Findley had

19  actually contacted Medical, he would not have required hospitalization on June 27, 2019.

20  (*Id.*)

21        Plaintiff was transferred to CHH for his cardiac arrest.  (*Id.*)  The doctors and nurses

22  were shocked that Plaintiff was being treated again due to the defendants' failure to

23  provide Plaintiff with his necessary medication.   (*Id.* at 14).   When Plaintiff was

24  discharged, the cardiologist told him that the cumulative effect of not taking his medication

25  is going to have an adverse effect on his health.  (*Id.*)

26        On July 2, 2019, Plaintiff filed an informal grievance "regarding this incident."  (*Id.*)

27  Defendant Rhynard claimed the issue was resolved, ignoring the fact that Plaintiff was

28  not receiving his medication in a timely manner.  (*Id.*)   Faulkner denied his first level

1  grievance and Miner denied his second level grievance.  (*Id.*)  These defendants were

2  put on notice when they received and reviewed each grievance Plaintiff filed about not

3  receiving his medication but none of them took action to ensure his medications were

4  ordered and delivered in a timely manner.  (*Id.*)

5        On August 10, 2019, Plaintiff submitted a kite to Defendant Bean.  (*Id.*)  In this

6  kite, Plaintiff recounted his difficulties in having his medication filled, prescribed, and

7  delivered in a timely manner and told him he needed the medication to live.  (*Id.*)

8  Defendant Bean responded that Plaintiff's medication had been renewed on July 24,

9  2019, but Plaintiff's medication was not renewed. (*Id.* at 14-15).  Bean had a constitutional

10  duty to look into and correct the issues raised by Plaintiff regarding Plaintiff not receiving

11  his medications.  (*Id.* at 15).

12        On August 18, 2019, Plaintiff sent a five-page letter to Williams recounting his

13  inability to maintain doses of his necessary medications.  (*Id.*)  Williams did not respond

14  and continued to take no action to correct the issues that continue to place Plaintiff's life

15  in jeopardy.  (*Id.*)

16        On August 26, 2019, Plaintiff submitted his request to refill his nitroglycerin

17  medications.  (*Id.*)  On September 3, 2019, Plaintiff was suffering chest pain and filed an

18  emergency grievance requesting that he receive that medication.  (*Id.*)  The nitroglycerine

19  was delivered from floor stock.  (*Id.*)  On September 5, 2019, Plaintiff returned to his cell

20  to take some medication for chest pain only to find that his cell was torn apart and his

21  nitroglycerine bottle was empty.  (*Id.*)  Plaintiff informed his unit officer that the

22  nitroglycerine was missing.  (*Id.*)  John Doe 7 and John Doe 8 took his medication.  (*Id.*)

23  Plaintiff asked to talk to Lieutenant Matousik because of his chest pain and his immediate

24  need for nitroglycerine.  (*Id.* at 17).  Lieutenant Matousik told Plaintiff to file an emergency

25  grievance even though she would be the one to respond to such a grievance and had

26  denied similar grievances in the past.  (*Id.*)  Plaintiff called a man down and was taken to

27  Medical where he was given three doses of nitroglycerine and then was transferred to the

28  hospital and underwent surgery to remove blockages from the stents that had been

1    placed in 2018.  (*Id.*)  While Plaintiff was in recovery, the cardiologist told him that the

2    blockage was due to the long delays in taking his medication over a year and a half. (*Id.*)

3    Every day that Plaintiff goes without his medications his life is at risk.  (*Id.*)  The doctor

4    put Plaintiff on the same medication.  (*Id.*)

5        On or about September 22, 2019, Plaintiff filed an emergency grievance over "this

6    incident."[6]  (*Id.*)   Defendant Hubbard-Pickett "wrongly 3098 this grievance," ignoring the

7    continued threat to Plaintiff's health and safety.  (*Id.*)

8        Plaintiff filed his second informal grievance on or about October 17, 2019.  (*Id.*)

9    Defendant Johnson denied the grievance and took no action to sanction Does 7 and 8 for

10   the cell search and confiscation of his medication that resulted in his man down and

11   hospital trip.  (*Id.* at 16-17).  Johnson also did not take any action to ensure that such a

12   similar incident did not occur again.  (*Id.* at 17.)

13       On October 25, 2019, Plaintiff submitted a request for refills of his medications.

14   (*Id.*)  On November 6, 2019, Plaintiff filed an emergency grievance because he had not

15   received his medication for 12 days.  (*Id.*)  John Doe 7 denied the grievance, stating that

16   Plaintiff's medication was at Medical and set for delivery. (*Id.*) Defendant Matousik

17   ignored Plaintiff's grievance where Plaintiff clearly stated that he needed his medication

18   because his chest hurt.  (*Id.*)  Likewise, Does 1-10 failed to bring Plaintiff his medication

19   even though they were in Medical, despite Plaintiff complaining of chest pain. (*Id.*)

20       On November 8, 2019, Plaintiff filed another informal grievance.  (*Id.*)  Defendant

21   Mathison denied this grievance.  (*Id.*)  Defendant Faulkner denied Plaintiff's grievance but

22   stated "we are aware of the issues that have existed with the timely delivery of kop

23   medications and the delays such as the ones that you referenced were occurring

24   regularly."  (*Id.*)  Defendant Miner denied Plaintiff's second level grievance, stating that

25   delays do occur from time to time.  (*Id.*)

26       Plaintiff continues to have difficulties getting his medications.  (*Id.* at 18).  On May

27

28       [6] It is not clear what incident Plaintiff is referencing, what information he provided
     to Hubbard-Pickett, what Hubbard-Pickett believed about Plaintiff's medical needs at that
     time, or what Hubbard-Pickett's response was.

1  25, 2020, Plaintiff filed another informal grievance.  (*Id.*)  This grievance was denied by

2  G. Piccinini.  (*Id.*)

3       On July 17, 2020, Plaintiff sent a kite to Warden Johnson recounting the

4  "loss/confiscation" of his medication.  (*Id.*)  Defendant Johnson took no action to "correct

5  the actions."  (*Id.*)

6       Based on these alleged events, Plaintiff brings claims for deliberate indifference to

7  serious medical needs in violation of the Eighth Amendment of the United States

8  Constitution and Article 1 Section 6 of the Nevada Constitution.  (*Id.* at 4.)  The Court

9  previously explained the applicable law to Plaintiff.[7]

10      The Court applies the same legal standards to the cruel and unusual punishment

11  provision included in Article 1 Section 6 of the Nevada Constitution as it does to the cruel

12  and unusual punishment provision of the Eighth Amendment of the United States

13  Constitution.  *Naovarath v. State*, 105 Nev. 525, 532 n.6 (1989); *Hutchins v. Nevada Dep't*

14  *of Corr.,* No. 3:10-CV-00369-LRH, 2011 WL 7575728, at *4, n.3 (D. Nev. Oct. 5, 2011),

15  *report and recommendation adopted*, No. 3:10-CV-00369-LRH, 2012 WL 993372 (D.

16  Nev. Mar. 22, 2012), *order corrected on reconsideration*, No. 3:10-CV-00369-LRH, 2012

17  WL 1982482 (D. Nev. June 4, 2012).

18      The Eighth Amendment prohibits the imposition of cruel and unusual punishment

19  and "embodies 'broad and idealistic concepts of dignity, civilized standards, humanity,

20  and decency.'"  *Estelle v. Gamble*, 429 U.S. 97, 102 (1976).  A prison official violates the

21  Eighth Amendment when he acts with "deliberate indifference" to the serious medical

22  needs of an inmate.  *Farmer v. Brennan*, 511 U.S. 825, 828 (1994).  "To establish an

23  Eighth Amendment violation, a plaintiff must satisfy both an objective standard—that the

24  deprivation was serious enough to constitute cruel and unusual punishment—and a

25  subjective standard—deliberate indifference."  *Snow v. McDaniel*, 681 F.3d 978, 985 (9th

26  Cir. 2012).

27      To establish the first prong, "the plaintiff must show a serious medical need by

28  

[7] ECF No. 13 at 8-10.

1  demonstrating that failure to treat a prisoner's condition could result in further significant
2  injury or the unnecessary and wanton infliction of pain." *Jett v. Penner*, 439 F.3d 1091,
3  1096 (9th Cir. 2006) (internal quotations omitted).

4       To prove deliberate indifference, a plaintiff must prove that the prison official
5  "knows of and disregards an excessive risk to inmate health or safety; the official must
6  both be aware of facts from which the inference could be drawn that a substantial risk of
7  serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837; *see*
8  *also Peralta v. Dillard*, 744 F.3d 1076, 1086 (9th Cir. 2014) (en banc). Thus, "a complaint
9  that a physician has been negligent in diagnosing or treating a medical condition does not
10  state a valid claim of medical mistreatment under the Eighth Amendment. Medical
11  malpractice does not become a constitutional violation merely because the victim is a
12  prisoner." *Estelle v. Gamble*, 429 U.S. 97, 106 (1976). Even gross negligence is
13  insufficient to establish deliberate indifference to serious medical needs. *See Toguchi v.*
14  *Chung*, 391 F.3d 1051, 1060 (9th Cir. 2004).

15       Furthermore, to satisfy the deliberate indifference prong, a plaintiff must show "(a)
16  purposeful act or failure to respond to a prisoner's pain or possible medical need and (b)
17  harm caused by the indifference." *Jett*, 439 F.3d at 1096. When a prisoner alleges that
18  delay of medical treatment evinces deliberate indifference, the prisoner must show that
19  the delay led to further harm. *See Shapley v. Nevada Bd. of State Prison Comm'rs*, 766
20  F.2d 404, 407 (9th Cir. 1985) (holding that "mere delay of surgery, without more, is
21  insufficient to state a claim of deliberate medical indifference").

22       Prison officials who know of a substantial risk to an inmate's health and safety are
23  liable only if they responded unreasonably to the risk, even if the harm ultimately was not
24  averted. *Farmer*, 511 U.S. at 844. What is reasonable depends on the circumstances,
25  including the defendant's authority, capabilities, and resources. *Peralta v. Dillard*, 744
26  F.3d 1076, 1084-85 (9th Cir. 2014) (en banc).

27       Furthermore, a defendant is liable under 42 U.S.C. § 1983 "only upon a showing
28  of personal participation by the defendant." *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir.

1    1989).  "Because vicarious liability is inapplicable to *Bivens* and § 1983 suits, a plaintiff
2    must plead that each Government-official defendant, through the official's own individual
3    actions, has violated the Constitution."  *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009).  Thus,
4    a supervisor may be found liable for his own harmful deliberate indifference but may not
5    be found liable merely because of his subordinate's harmful deliberate indifference. *Starr*
6    *v. Baca*, 652 F.3d 1202, 1206-07 (9th Cir. 2011).

7           The Court finds that Plaintiff has adequately alleged serious medical needs, which
8    are his heart condition and consequent need for taking prescribed medications at the
9    appropriate time.   The issue is which defendants caused Plaintiff harm by being
10   deliberately indifferent his serious medical needs.

11          Plaintiff concludes that Does 1 and 2 transport officers[8] and Dr. Bryan and John
12   Does 3-10 violated his rights when they failed to obtain Plaintiff's medications before
13   transferring him back to prison.  (ECF No. 21-1 at 19).   In addition, he concludes that
14   Defendants Dr. Bryan and Does 3 and 4 are liable because "they were told by Plaintiff
15   upon being returned to HDSP" and knew that Plaintiff required medicine and could die
16   without them and that he had been provided with 30 days of medication at the hospital
17   but denied Plaintiff medications for days instead of simply picking up his medication at
18   the hospital.  (*Id.*)  As a result, Plaintiff had to be readmitted to the emergency room, have
19   multiple procedures, and will continue to suffer injuries.  (*Id.*)

20          To the extent Plaintiff is alleging deliberate indifference based on the alleged failure
21   of Dr. Bryan and John Does 1-10 to obtain the 30-day supply of medication before Plaintiff
22   was transferred back to HDSP, the Court finds that Plaintiff fails to state a colorable claim.
23   Plaintiff does not allege facts sufficient to show that Dr. Bryan or any other defendant
24   aside from the transport officers even knew about the availability of the 30-day supply of
25   medications prior to Plaintiff arriving back at HDSP.  In addition, Plaintiff does not allege
26   facts sufficient to show that the Doe transport officers did not believe that HDSP Medical

27
28          [8] Earlier in the complaint, Plaintiff alleges that the transport officers were Does 3
     and 4. (ECF No. 21-1 at 6).  Regardless of the numbers, Plaintiff does not allege facts
     sufficient to show deliberate indifference by the transport officers.

1
2
3

would take care of the medication when they told Plaintiff that. Plaintiff therefore has not alleged facts that would show deliberate indifference by any defendant prior to Plaintiff arriving back at HDSP.

4
5
6
7
8
9
10
11
12
13
14

However, the Court finds that Plaintiff has stated a colorable claim against Dr. Bryan based on the alleged failure to obtain the 30-day supply from the hospital once he learned of Plaintiff's need for the prescribed medication, learned that the 30-day supply was available at the hospital, and knew that such medication was not then available at HDSP. Plaintiff also adequately alleges that this harmed due to his subsequent hospitalization. Therefore, this claim may proceed against Dr. Bryan. To the extent Plaintiff alleges that the Doe transport officers were deliberately indifferent after his return to HDSP, he fails to allege facts sufficient to show that those defendants knew that he was being denied medications at the prison, had the ability to obtain the medication, but refused to do so. Therefore, Plaintiff fails to state a colorable claim against any Doe defendant based on allegations concerning the 30-day supply of medications.

15
16
17
18
19
20
21
22
23
24
25
26
27
28

Plaintiff also concludes that Defendants Bryan and Faulkner acted with deliberate indifference when they failed to follow the cardiologist's directive to follow prescribed treatment and the two-week review of Plaintiff by a cardiologist. (*Id.* at 19.) With regard to the two-week follow-up, Plaintiff fails to state a colorable claim. Plaintiff does not allege facts sufficient to show that either Dr. Bryan or Faulkner knew about the instructions for a follow-up. In addition, according to Plaintiff's own allegations, Plaintiff was treated by a cardiologist within two weeks. Therefore, to the extent Plaintiff is attempting to state a constitutional claim based on the alleged failure of Dr. Bryan or Faulkner to follow the doctor's order for a two-week follow-up, he fails to allege facts sufficient to show deliberate indifference causing him harm and the Court therefore dismisses these claims. To the extent Plaintiff is merely alleging that Defendants Dr. Bryan and Faulkner had a general duty to ensure that he received his medications, apart from any knowledge that Plaintiff did not have his medications, such allegations are not sufficient to allege deliberate indifference and the Court dismisses with prejudice these claims as well.

Plaintiff concludes that his rights were violated by defendants Brian Williams, Michael Miner, RN Mary, Weber, Findley, RN Jaymie, B. Faulkner, Matousik, Dr. Bryan, Rhynard, Warden Johnson, A.W. Bean, G. Piccinini, Hubbard-Pickett, Mathison, and John Does 1-10 when they were notified that Plaintiff was in need of his medication. (*Id.* at 18). He alleges that their inaction led to Plaintiff having another heart attack and requiring additional surgery and admissions to the emergency room. (*Id.* at 18). Plaintiff also concludes that each of the named defendants were personally put on notice that Plaintiff required medication to ensure that he did not suffer another heart attack and were put on notice that Plaintiff was not receiving his medications. (*Id.* at 19-20). Plaintiff further concludes that each defendant had a duty and an obligation to ensure that he received his medication and did not go weeks without taking his medication, but they failed, resulting in Plaintiff going without his medication and suffering another heart attack and surgery to fix the stent that had become blocked as a result of going without the medication. (*Id.* at 20).

To the extent Plaintiff is asserting that any defendant was deliberately indifferent merely because the defendant did not ensure that Plaintiff received his medication, regardless of whether that defendant knew that Plaintiff did not have his medication or was experiencing ongoing problems obtaining the medication, Plaintiff does not state a colorable claim.

However, liberally construing the amended complaint at the screening stage, the Court finds that Plaintiff states colorable federal and state claims for deliberate indifference to serious medical needs against defendants Brian Williams, Michael Miner, R.N. Mary, Weber, Findley, Nurse Jaymie, Faulkner, Matousik, Rhynard, A.W. Bean, Piccinini, and Mathison based on allegations that would show that these defendants were aware that Plaintiff did not have his required medication or knew that there were ongoing issues regarding Plaintiff receiving his medication in a timely manner but chose not to address these problems, causing him to suffer harm to his cardiac health. Therefore, these claims may proceed.

The Court finds that, to the extent Plaintiff alleges that there were Doe defendants who were aware of his heart condition and his need for medication, knew that there was medication available at High Desert State Prison, but deliberately chose not to provide that medication, Plaintiff states colorable federal and state claims for deliberate indifference to serious medical needs. Those claims may proceed when Plaintiff learns the true names of these Doe defendants and moves to substitute their true names.

However, the Court finds that Plaintiff does not state any other colorable federal or state claims for deliberate indifference to serious medical needs. To the extent Plaintiff alleges that Doe defendants were deliberately indifferent to his serious medical needs when they did not provide him with his medication without alleging facts sufficient to show that those Defendants were aware that the medication was available, Plaintiff does not state a colorable claim.

Furthermore, other than Plaintiff's initial issue regarding the 30-day supply of medication offered by the hospital, Plaintiff does not allege facts sufficient to show that Dr. Bryan was aware that Plaintiff was in need of medication but nevertheless refused to provide it. Therefore, to the extent Plaintiff is attempting to state a colorable claim against Dr. Bryan for any other incident regarding his medication, Plaintiff fails to state a colorable claim.

In addition, Plaintiff's allegations that he informed Defendant Johnson after the fact that his medication had been taken from his cell, such allegations are not sufficient to state a colorable claim. Plaintiff does not allege facts sufficient to show that Johnson knew that Plaintiff was currently without medication or had a chronic ongoing problem obtaining or keeping his medication and caused Plaintiff to go without medication. Plaintiff therefore fails to state a colorable claim against Defendant Johnson.

Plaintiff also does not allege facts sufficient to show that Hubbard-Pickett believed that Plaintiff did not have medication or was experiencing ongoing problems with obtaining medication and caused him harm. Plaintiff therefore fails to state a colorable claim against Hubbard-Pickett.

1    Plaintiff also fails to allege any facts concerning defendant Dzurenda and therefore

2    fails to state a colorable claim against him.

3    **B.  Count Two**

4    Count Two of the first amended complaint seeks to bring state-law tort claims

5    against Defendants for negligence, gross negligence, and recklessness.  (ECF No. 21-1

6    at 21).

7    NRS 41.0337 provides that no Nevada state tort action may be brought against a

8    person who is named as a defendant solely because of an act or omission relating to the

9    public duties or employment of an officer or employee of the state or political subdivision

10   unless the state or appropriate political subdivision is "named a party defendant under

11   NRS 41.031."  Thus, the State of Nevada is an indispensable party in such a tort claim.

12   *Cf. Craig v. Donnelly*, 439 P.3d 413, 415 (Nev. App. 2019) (holding that court was required

13   under NRS 41.031 and NRS 41.0337 to dismiss state tort claims because plaintiff had

14   not included the State of Nevada as a defendant); *see also Nunnelley v. Douglas Cty.*,

15   622 F. Supp. 124, 126 (D. Nev. 1985) (indicating that, under NRS 41.031, county that

16   employed alleged tortfeasor was indispensable party).   However, the State of Nevada

17   has not waived its Eleventh Amendment sovereign immunity and therefore may not be

18   sued in federal court for a state-law tort claim.  *See O'Connor v. State of Nev.*, 686 F.2d

19   749, 750 (9th Cir. 1982) (recognizing that, under the Eleventh Amendment, a state or its

20   agencies cannot be sued in federal court without the state's consent and Nevada explicitly

21   has refused to waive its Eleventh Amendment immunity).

22   Thus, any tort actions Plaintiff seeks to bring based on the facts alleged in the

23   complaint must be brought in state court, not federal court.  *See Hirst v. Gertzen*, 676

24   F.2d 1252, 1263–65 (9th Cir. 1982) (holding that, where Montana state law deemed

25   governmental entity to be an indispensable party in any negligence action brought against

26   its employee, the federal court had no supplemental jurisdiction over the state law claim

27   if it had no jurisdiction over the indispensable party); *Nunnelley v. Douglas Cty.*, 622 F.

28   Supp. 124, 126 (D. Nev. 1985) (absent federal jurisdiction over county, the federal court

had no jurisdiction over county on the supplemental state claims).

Accordingly, due to sovereign immunity, Plaintiff may not sue arms of the state in this action, and he may not sue the state employees in this action because he alleges that they engaged in tortious conduct relating to their employment.  Therefore, the Court dismisses Count Two without prejudice and without leave to amend.

## III.    MOTION FOR APPOINTMENT OF COUNSEL

After the Court denied Plaintiff's motion for appointment of counsel and stayed the case for purposes of mediation, Plaintiff filed another motion for appointment of counsel. (ECF No. 16).  After mediation was unsuccessful, Plaintiff subsequently filed an amended complaint.

As the Court previously explained, a litigant does not have a constitutional right to appointed counsel in 42 U.S.C. § 1983 civil rights claims.  *Storseth v. Spellman*, 654 F.2d 1349, 1353 (9th Cir. 1981).  Pursuant to 28 U.S.C. § 1915(e)(1), "[t]he court may request an attorney to represent any person unable to afford counsel."  However, the court will appoint counsel for indigent civil litigants only in "exceptional circumstances."  *Palmer v. Valdez*, 560 F.3d 965, 970 (9th Cir. 2009) (§ 1983 action).  "When determining whether 'exceptional circumstances' exist, a court must consider 'the likelihood of success on the merits as well as the ability of the petitioner to articulate his claims *pro se* in light of the complexity of the legal issues involved."  *Id.*  "Neither of these considerations is dispositive and instead must be viewed together."  *Id.*  In the instant case, the Court does not find exceptional circumstances that warrant the appointment of counsel.  It is very common for prisoners raising medical issues to request the appointment of counsel, and being a prisoner with no legal experience raising such issues is not exceptional. Furthermore, although Plaintiff indicates that he is dyslexic and that he has trouble communicating, to date Plaintiff has been able to communicate with the Court in a manner that is just as clear or clearer than the average pro se prisoner, including the amended complaint.  In addition, although the Court has found that Plaintiff has stated colorable claims based

1   merely on his allegations, it would be premature for the Court to reach a conclusion

2   regarding Plaintiff's likelihood of success in this case based on evidence.  Therefore, the

3   Court finds that there are not exceptional circumstances and denies without prejudice the

4   second motion for appointment of counsel.

5   **IV.   CONCLUSION**

6       For the foregoing reasons, it is ordered that Plaintiff's application to proceed *in

7   forma pauperis* (ECF No. 11) is **GRANTED**.  Plaintiff shall not be required to pay an initial

8   installment of the filing fee.  In the event that this action is dismissed, the full filing fee

9   must still be paid pursuant to 28 U.S.C. § 1915(b)(2).

10      It is further ordered that the movant herein is permitted to maintain this action to

11  conclusion without the necessity of prepayment of any additional fees or costs or the

12  giving of security therefor.  This order granting leave to proceed *in forma pauperis* shall

13  not extend to the issuance and/or service of subpoenas at government expense.

14      It is further ordered that, pursuant to 28 U.S.C. § 1915(b)(2), the Nevada

15  Department of Corrections shall pay to the Clerk of the United States District Court,

16  District of Nevada, 20% of the preceding month's deposits to Plaintiff's account (**David

17  A. Hano, # 82618**), in the months that the account exceeds $10.00, until the full $350.00

18  filing fee has been paid for this action.  The Clerk of the Court shall **SEND** a copy of this

19  order to the Finance Division of the Clerk's Office.  The Clerk of the Court shall also **SEND**

20  a copy of this order to the attention of the Chief of Inmate Services for the Nevada

21  Department of Corrections, P.O. Box 7011, Carson City, NV 89702.

22      It is further ordered that the motion to file an amended complaint (ECF No. 21) is

23  granted and the operative complaint is the first amended complaint (ECF No. 21-1).

24      It is further ordered that the § 1983 claims against the NDOC and the HDSP

25  Medical Department are dismissed with prejudice, as amendment would be futile.

26      It is further ordered that the state constitution claims in Count 1 against the NDOC

27  and the HDSP Medical Department are dismissed without prejudice and without leave to

28  amend.

1   It is further ordered that the federal and state claims in for deliberate indifference
2   to serious medical needs based on the allegations concerning the 30-day supply of
3   medication available at the hospital may proceed against Dr. Bryan.

4   It is further ordered that the federal and state claims for deliberate indifference to
5   serious medical needs against defendants Brian Williams, Michael Miner, R.N. Mary,
6   Weber, Findley, Nurse Jaymie, Faulkner, Matousik, Rhynard, A.W. Bean, Piccinini, and
7   Mathison may proceed based on allegations that these Plaintiffs knew that Plaintiff was
8   did not have his medication or had an going problem receiving his medication in a timely
9   manner.

10  It is further ordered that, after Plaintiff substitutes their true names, the federal and
11  state claims for deliberate indifference to serious medical needs may proceed against the
12  Doe defendants who allegedly were aware of Plaintiff's heart condition and his need for
13  medication, knew that there was medication available at High Desert State Prison, but
14  nevertheless made the deliberate choice not to provide that medication.

15  It is further ordered that any federal or state claims for deliberate indifference to
16  serious medical needs in Count 1 that are not mentioned in this conclusion are dismissed
17  with prejudice.

18  It is further ordered that Count Two, alleging state tort law claims, is dismissed
19  without prejudice and without leave to amend.

20  It is further ordered that Plaintiff's second motion for appointment of counsel (ECF
21  No. 16) is denied without prejudice.

22  It is further ordered that this case is no longer stayed.

23  It is further ordered that the Clerk of the Court shall electronically **SERVE** a copy
24  of this order and a copy of Plaintiff's first amended complaint (ECF No. 21-1) on the Office
25  of the Attorney General of the State of Nevada by adding the Attorney General of the
26  State of Nevada to the docket sheet.  This does not indicate acceptance of service.

27  It is further ordered that service must be perfected within ninety (90) days from the
28  date of this order pursuant to Fed. R. Civ. P. 4(m).

1      It is further ordered that subject to the findings of this order, within twenty-one (21)

2   days of the date of entry of this order, the Attorney General's Office shall file a notice

3   advising the Court and Plaintiff of: (a) the names of the defendants for whom it accepts

4   service; (b) the names of the defendants for whom it does not accept service, and (c) the

5   names of the defendants for whom it is filing the last-known-address information under

6   seal.  As to any of the named defendants for whom the Attorney General's Office cannot

7   accept service, the Office shall file, under seal, but shall not serve the inmate Plaintiff the

8   last known address(es) of those defendant(s) for whom it has such information.  If the last

9   known address of the defendant(s) is a post office box, the Attorney General's Office shall

10  attempt to obtain and provide the last known physical address(es).

11     It is further ordered that if service cannot be accepted for any of the named

12  defendant(s), Plaintiff shall file a motion identifying the unserved defendant(s), requesting

13  issuance of a summons, and specifying a full name and address for the defendant(s).  For

14  the defendant(s) as to which the Attorney General has not provided last-known-address

15  information, Plaintiff shall provide the full name and address for the defendant(s).

16     It is further ordered that if the Attorney General accepts service of process for any

17  named defendant(s), such defendant(s) shall file and serve an answer or other response

18  to the complaint within sixty (60) days from the date of this order.

19     It is further ordered that, henceforth, Plaintiff shall serve upon defendant(s) or, if

20  an appearance has been entered by counsel, upon their attorney(s), a copy of every

21  pleading, motion or other document submitted for consideration by the Court.  Plaintiff

22  shall include with the original document submitted for filing a certificate stating the date

23  that a true and correct copy of the document was mailed or electronically filed to the

24  defendants or counsel for the defendants.  If counsel has entered a notice of appearance,

25  Plaintiff shall direct service to the individual attorney named in the notice of appearance,

26  at the physical or electronic address stated therein.   The Court may disregard any

27  document received by a district judge or magistrate judge which has not been filed with

28  the Clerk, and any document received by a district judge, magistrate judge, or the Clerk

1   which fails to include a certificate showing proper service.

2        DATED THIS   3   day of   Sept.   2020.

3

4                                                Gloria M. Navarro, Judge
                                                 United States District Court
5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28